UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 3:10-cr-132 (CFD) |
| | : | |
| WOLFE MIKELIC | : | |

**RULING ON MOTION TO SUPPRESS**

The defendant, Wolfe Mikelic, is charged with conspiracy to distribute and possession with intent to distribute marijuana.[1] Mikelic has moved to suppress evidence obtained from a search of an automobile and its contents conducted by a Nebraska police officer on January 27, 2010, claiming that the search lacked probable cause. The Court held an evidentiary hearing on January 5, 2011. The Court's findings of fact and conclusions of law follow.

**I.   Findings of Fact**

At approximately 8:21 a.m. on January 27, 2010, Trooper Ryan Henrichs of the Nebraska State Patrol initiated a traffic stop after observing a car drive on the shoulder of Interstate 80 West in Lincoln, Nebraska. The car that Trooper Henrichs pulled over was a Ford Explorer with New York license plates. Bret Battistelli, Mikelic's half-brother, was driving the vehicle and was the lone occupant.

---

[1] Mikelic is charged in a two count indictment with conspiracy to possess with the intent to distribute 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vii) (Count One) and possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(c) (Count Two).

Trooper Henrichs approached the Ford Explorer and made contact with Battistelli through the front passenger window of the vehicle. Trooper Henrichs advised Battistelli of the reason for the traffic stop—driving on the shoulder of the highway—and asked for Battistelli's license and the rental agreement for the vehicle. While waiting for Battistelli to retrieve the requested documentation, Trooper Henrichs observed a GPS device attached to the windshield and binoculars on the floor in the back seat. Battistelli handed Trooper Henrichs his California driver's license and a Hertz car rental agreement. The Hertz rental agreement indicated that the rental was a one-way, one-week rental and that Battistelli planned to return the vehicle to the Oakland airport in California. The rental agreement also indicated that Battistelli had rented the vehicle from Hertz on January 22, 2010, at the John F. Kennedy International Airport in New York. When Battistelli handed Trooper Henrichs the requested documentation, Battistelli's hand was "shaking very badly" and he appeared nervous.

Trooper Henrichs asked Battistelli if he was willing to get out of the rental car and sit in the patrol car while Trooper Henrichs completed the motor vehicle enforcement action. Battistelli agreed. On his way back to the patrol car, Trooper Henrichs looked into the back window of the Ford Explorer and observed two bags in the rear cargo area—a dark suitcase that had an airlines baggage claim identification strip attached to it and a blue duffel bag, located on top of the suitcase, with no airlines identification strip or other identification tag. The blue duffel bag appeared to be "brand new."

Both Trooper Henrichs and Battistelli entered the patrol car. Trooper Henrichs processed Battistelli's information for purposes of issuing a warning and ran a driver's license and criminal

history check.  Because Trooper Henrichs was suspicious of criminal activity,[2] he also ran an "EPIC" check.[3]  While completing the required paperwork for the traffic stop and waiting for the results of the EPIC check, Trooper Henrichs and Battistelli engaged in conversation.  Battistelli informed Trooper Henrichs that he had flown from his home in Oakland, California to New York to visit family for one day.  Battistelli also told Trooper Henrichs that, after leaving New York, he had driven a relative to Pittsburgh and was driving to Park City, Utah, to see a friend, prior to returning the rental car in Oakland.

Trooper Henrichs issued Battistelli a warning for driving on the shoulder of the highway and returned his license and car rental agreement to him.  As Battisetelli opened the passenger door of the patrol car to return to his vehicle, Trooper Henrichs asked if he could talk to him further and Battistelli agreed.  Battistelli sat back down in the front passenger seat of the patrol car and closed the door.  At that point, Trooper Henrichs engaged Battistelli in a conversation regarding Battistelli's travel plans.  Upon Trooper Henrichs then inquiring as to whether Battistelli had any illegal drugs or large amounts of money in the rental vehicle, Battistelli denied possessing any drugs but admitted that he had "some cash."

Following Battistelli's admission of having "some cash," Trooper Henrichs asked Battistelli for permission to search the rental car, but Battistelli refused.  Trooper Henrichs then

---

[2] Trooper Henrichs was suspicious of Battistelli's involvement in criminal activity due to a number of reasons: (1) Battistelli had rented a high-priced SUV but did not have much cargo or any other occupants; (2) Trooper Henrichs had observed an unusual assortment of items in the car (GPS, binoculars, and two bags); and (3) Battistelli appeared and remained nervous throughout the duration of the traffic stop.

[3] "EPIC" is the El Paso Intelligence Center.  Police perform EPIC checks to obtain more in-depth information about a person's criminal history.

requested a canine unit to come to the scene and circle the exterior of Battistelli's car for the purpose of detecting drugs. The canine arrived, but did not indicate the presence of drugs. Trooper Henrichs explained to Battistelli, however, that he believed he had probable cause to search the vehicle and, therefore, Battistelli was not free to leave.[4] Trooper Henrichs advised Battistelli of his constitutional rights and Battistelli indicated that he wanted to speak to a lawyer. Battistelli was given the opportunity to call a lawyer; however, no lawyer was brought to the scene of the traffic stop.

After advising Battistelli of his constitutional rights, Trooper Henrichs exited the patrol car and approached the rental vehicle. Trooper Henrichs opened the glass window on the back hatch of the Ford Explorer and examined the blue duffel bag. The bag was zipped closed, but the bag was not locked and it had no airlines identification strip or other personal identification tag affixed to it. Trooper Henrichs unzipped the duffel bag and found a large amount of U.S. currency that was rubber-banded together and stored in what appeared to be heat-sealed plastic bags. Trooper Henrichs then went back to the patrol car and placed Battistelli in handcuffs prior to transporting him back to the Nebraska State Patrol office.

Battistelli was transported to the Nebraska State Patrol's traffic office where he was read an Advice of Rights form, which he then signed.[5] Battistelli's rental car was also transported to the traffic office where it was searched in its entirety. At the traffic office, a canine indicated to

---

[4] Trooper Henrichs testified that, based on the totality of the circumstances, including Battistelli admitting to having "some cash" but not being able to explain the legitimacy of that cash and Battistelli's prolonged nervousness, he believed that he had probable cause to search the rental vehicle.

[5] The Advice of Rights form was similar to a Miranda rights form.

the odor of drugs coming from the money found in the blue duffel bag.  In addition to the money, several other items were found during the search of the Ford Explorer, including: (1) a notebook, which appeared to be a drug ledger;[6] (2) shipping papers and other documents that were stored in the notebook; and (3) a camera, which was found in the pocket of a coat lying on the passenger's seat, that had photographs of large marijuana fields in it.[7]  The suitcase, which Trooper Henrichs had previously seen in the car below the blue duffel bag, was also examined.  The airlines tag on the suitcase bore the name "Battistelli," and the suitcase contained clothes.  Battistelli refused to talk about the money in the duffel bag.  Once the search of the rental vehicle was completed, Battistelli was permitted to leave the traffic office in the Ford Explorer.  The cash and other items were seized.

Mikelic also testified at the evidentiary hearing, and stated that: (1) Battistelli is his half brother; (2) Mikelic previously was a partner in a family business involving wireless communications; (3) from that wireless communications business, Mikelic received a payment of approximately $170,000 after the company filed for bankruptcy in 2006; (4) Battistelli approached Mikelic in 2009 about investing money in a new company that would buy and sell custom auto parts in bulk; (5) Mikelic and Battistelli became partners in that auto parts business—Battistelli handled the active day-to-day operations and Mikelic provided the financing; (6) Battistelli flew to New York in January 2009 and drove a Ford Explorer rental vehicle to Mikelic's house in New York; (7) Mikelic gave Battistelli $25,000 to $26,000 in cash

---

[6] The notebook was found between the front driver's seat and the center console, and it contained handwritten markings dealing with different increments of pounds.

[7] The photographs appeared to show Battistelli standing in marijuana fields.

to invest in the auto parts business; (8) Mikelic placed the cash and some related business records[8] in a blue duffel bag that he owned, zipped closed the duffel bag, and placed a combination lock on the bag; and (9) Mikelic placed the duffel bag in the rear cargo area of the Ford Explorer. The Court, however, does not find Mikelic's testimony credible in any material part, except for the family relationship with Battistelli.

Following the seizure of cash and other items from Battistelli's car, including the discovery of the shipping papers revealing a Branford, Connecticut delivery address, the Branford Police Department placed the Branford storage unit under surveillance for three days and obtained a subpoena for utility subscriber information for the Branford storage unit. That subpoena revealed that "Wolfe Mikelic" was the subscriber for the Branford storage unit. An East Haven canine unit subsequently conducted an exterior sweep of the Branford storage unit and the canine indicated to the presence of drugs. On January 29, 2010, Branford police observed Mikelic receive a shipment at the Branford storage unit. Based on this information, a Connecticut search warrant for the Branford storage unit was obtained and executed, a large quantity of marijuana was discovered, and Mikelic was arrested and subsequently indicted for the marijuana-related offenses.

---

[8] Mikelic, however, could only identify two of the documents found inside the notebook. These two documents—a shipping invoice and a bill of lading—contained the name and address of Mikelic's alleged business: Crown Company, 4 Sycamore Way, Building A Unit 7, Branford, Connecticut. Further investigation revealed that the Crown Company's location in Branford, Connecticut was a storage/commercial rental space.

## II. Conclusions of Law

Mikelic claims that he had a reasonable expectation of privacy in Battistelli's rental car and the items searched and seized from that car, and that Trooper Henrichs lacked probable cause to search the car. Consequently, Mikelic claims that all of the evidence obtained as result of the Nebraska search and seizure should be suppressed.[9]

### A. Reasonable Expectation of Privacy[10]

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Rakas v. Illinois, 439 U.S. 128, 133–34 (1978). A defendant has standing to suppress evidence on Fourth Amendment grounds only if the breached privacy expectation was his own rather than that of a third party.[11] See id.; see also Alderman v. United States, 394 U.S. 165, 171–72 (1969) ("[S]uppression of the product of a Fourth

---

[9] Mikelic has also moved to suppress evidence obtained as a result of a subsequent search warrant that was executed in Connecticut on the ground that the Connecticut search warrant for the Branford rental space relied on the Nebraska stop and seizure, and, therefore, any evidence obtained from the Connecticut search warrant constitutes fruit of the poisonous tree. This issue, however, is not before the Court at this time.

[10] The Court will first address whether Mikelic had a reasonable expectation of privacy in Battistell's rental car or the items searched and seized from Battistelli's rental car and, thus, determine whether Mikelic has standing to contest the legality of the Nebraska search and seizure.

[11] The Supreme Court has rejected the use of the term "standing" when analyzing a defendant's ability to assert his Fourth Amendment rights. See Rakas, 439 U.S. at 139–40. The Supreme Court prefers to frame the analysis under substantive Fourth Amendment law, examining a defendant's "reasonable expectation of privacy." See id. Some Second Circuit and District of Connecticut opinions, however, have continued to use the term "standing" when examining Fourth Amendment issues under the reasonable expectation of privacy" analysis. See, e.g., United States v. Fields, 113 F.3d 313, 320 (2d Cir. 1997); United States v. Elmore, 359 F. Supp. 2d 105, 116 n.10 (D. Conn. 2005), overruled on other grounds by United States v. Elmore, 482 F.3d 172 (2d Cir. 2007).

Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence."). The burden is on the defendant to prove that his Fourth Amendment rights were violated by the challenged search or seizure and, therefore, that he has standing. Rawlings v. Kentucky, 448 U.S. 98, 104–05 (1980); United States v. Osorio, 949 F.2d 38, 40 (2d Cir. 1991).

For an individual's expectation of privacy to be implicated, he must have exhibited an actual and subjective expectation of privacy in the area or item searched and the expectation must be one that society is prepared to recognize as reasonable. See Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring); Rakas, 439 U.S. at 140–44; United States v. Haqq, 278 F.3d 44, 50 (2d Cir. 2002) ("A defendant must also show that his expectation [of privacy] is reasonable, i.e. one that has a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." (internal quotations omitted) (alteration in original)). In making this determination, courts generally consider whether the defendant had any property or possessory interest in the place searched or the items seized. See Osorio, 949 F.2d at 40; see also United States v. Baker, 221 F.3d 438, 442 (3d Cir. 2000) ("[W]hether the driver of a car has the reasonable expectation of privacy necessary to show Fourth Amendment standing is a fact-bound question dependent on the strength of his interest in the car and the nature of his control over it; ownership is not necessary").

Courts have routinely distinguished between a defendant's reasonable expectation of privacy in an "area" and a defendant's reasonable expectation of privacy in an "item." See, e.g., Elmore, 359 F. Supp. 2d at 116 (distinguishing between a reasonable expectation of privacy in

one's apartment and a reasonable expectation in closed containers found in an apartment). Here, Mikelic only has standing to challenge the Nebraska search and seizure if the Court finds that he has a reasonable expectation of privacy in either Battistelli's rental car, or a reasonable expectation of privacy in the duffel bag or other items seized from Battistelli's rental car. See id.; see also United States v. Perea, 986 F.2d 633, 641–42 (2d Cir. 1993).

### 1. *Reasonable Expectation of Privacy in Battistelli's Rental Car*

The evidence shows that Mikelic had no property or possessory rights in the rental Ford Explorer that Battistelli was driving in Nebraska and that was the subject of the search and seizure in Nebraska. According to the rental agreement that Battistelli provided to Trooper Henrichs, Battistelli personally rented the Ford Explorer from Hertz at the John F. Kennedy International Airport in New York. Mikelic's name was not on the rental agreement nor was Mikelic an authorized driver of the rental vehicle. See United States v. Edwards, 632 F.3d 633, 641 (10th Cir. 2001) (holding that the defendant did not have standing to challenge the search of a rental car that was rented in his girlfriend's name and that he was not an authorized driver of). Additionally, no business entity that could be claimed to be the business Mikelic and Battistelli operated is listed on the rental agreement. Therefore, Mikelic does not have a reasonable expectation of privacy in the rental car and, thus, does not have standing to challenge the search of the car itself. See Rakas, 439 U.S. at 148–49 (holding that a passenger who asserts neither a possessory nor a property interest in a vehicle would not have a legitimate expectation of privacy in the vehicle); United States v. Smith, 621 F.2d 483, 487 (2d Cir. 1980) (finding that the defendant did not have a legitimate expectation of privacy in a car that he had no ownership interest in).

## 2. *Reasonable Expectation of Privacy in Duffel Bag and Other Items*

Although Mikelic does not have a reasonable expectation of privacy in Battistelli's rental car, the Court must also consider whether Mikelic had a reasonable expectation of privacy in the blue duffel bag and the other items seized from the car, including the suitcase, notebook, camera, GPS device, and binoculars. See Elmore, 359 F. Supp. 2d at 119 ("[T]he owner of a closed bag has a reasonable expectation of privacy in the bag . . . even if the person does not have a reasonable expectation of privacy in the location the bag was seized." (citing Perea, 986 F.2d at 641–42; United States v. McGrath, 613 F.2d 361, 365–66 (2d Cir. 1979)); Edwards, 632 F.3d at 641 (stating that where police searched bags found in the trunk of a rental car, the court must determine whether the defendant has standing to challenge the search of the bags, even if the defendant does not have standing to challenge the search of the rental car itself"). But see United States v. Wellons, 32 F.3d 117, 199 (4th Cir. 1994) ("A person who cannot assert a legitimate claim to a vehicle cannot reasonably expect that the vehicle is a private repository for his personal effects, whether or not they are enclosed in some sort of a container . . . ." (internal quotations omitted)). In making this determination, the Court must consider the "totality of the circumstances," see Rawlings, 448 U.S. at 104, including factors such as ownership, custody, and the defendant's subjective belief. See also Baker, 221 F.3d at 442 (noting that the reasonable expectation of privacy inquiry is a fact-based inquiry).

Mikelic claims that he owned the blue duffel bag and that he placed approximately $25,000 of cash into the bag along with a notebook that included business records pertaining to the purported auto parts business, and then locked the bag. Nonetheless, there is no credible evidence that Mikelic had any property or possessory right in the blue duffel bag, its contents, or

the other items found in Battistelli's rental car.[12]  Although the blue duffel bag found in Battistelli's car was zipped closed, the bag was not locked or secured in any way and Mikelic's name or other form of identification did not appear on or inside the bag.  Cf. Edwards, 632 F.3d at 642 (holding that the defendant had a reasonable expectation of privacy in bags that he owned, which were found stored in the trunk of a rental car, and contained the defendant's clothing and toiletries, along with contraband).  In fact, the only form of identification in the rear cargo area was the airport luggage tag affixed to the suitcase, which was located immediately under the duffel bag, and bore Battistelli's name.  Cf. United States v. Davis, 332 F.3d 1163, 1168 (9th Cir. 2003) (finding strong support for an expectation of privacy where the bag that the defendant claimed an interest in was stored under his own bed).  Furthermore, even if the Court were to find Mikelic's testimony credible and find that Mikelic owned the blue duffel bag, courts have held that mere ownership of an item is insufficient to create a reasonable expectation of privacy. See Rawlings, 448 U.S. at 105–06; United States v. Gerena, 662 F. Supp. 1218, 1254 (D. Conn. 1987) ("While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated . . . ownership alone is not dispositive." (internal quotations and citations omitted)).  There is also no evidence that Mikelic owned, possessed, or had an expectation of privacy in the camera, GPS device, or binoculars that Trooper Henrichs found in Battistelli's rental car.  At most, Mikelic may have had a subjective expectation of privacy in the contents of the blue duffel bag and the two documents he could identify from the notebook, however, based on the evidence, that belief is not one that society would deem reasonable.  See United States v. DeLouya, No. 1:04CR58, 2005 WL 3244173, at

---

[12] Again, the Court does not find Mikelic's testimony credible.

*16 (N.D.N.Y. Nov. 30 2005) ("As to vehicles, the defendant must establish that he had a subjective desire to keep his effects private, and that his subjective wish is one society finds reasonable." (citing United States v. Paulino, 850 F.2d 93, 97 (2d Cir. 1988)). Indeed, the two documents that Mikelic identified at the hearing were not even found inside the duffel bag; rather, the documents were stuffed inside the notebook that was located between the driver's seat and the center console of the Ford Explorer and in plain view of Trooper Henrichs.

Mikelic also claims that he has a reasonable expectation of privacy in the contents of the bag because he entrusted them to Battistelli in a bailor/bailee relationship. However, there is no credible evidence that such a relationship existed and, furthermore, courts have distinguished between the privacy interests of a bailor as compared to those of a bailee. See Rawlings, 448 U.S. at 105–06 (finding that a defendant (bailor) who placed drugs in a friend's purse (bailee) did not have standing to object to the search of the purse); Perea, 986 F.2d at 641 (distinguishing the privacy expectations of a bailor who has relinquished custody from those of a bailee, who does not own the item, but has control of it); United States v. Miller, No. 96 Civ. 0412, 1997 WL 109565, at *2 n.2 (S.D.N.Y. Mar. 12, 1997) (noting that Perea only recognized that bailees may have a sufficient interest in bailed property but did not address the interest of a bailor). Here, there is no credible evidence that Mikelic entrusted the cash or other items in Battistelli's control and Mikelic had no right to exclude others from the contents of the bag.

Accordingly, Mikelic did not have any ownership or possessory interest in the items search and seized from Battistelli's rental car and, thus, does not have a reasonable expectation of privacy in any of those items.

B. <u>Nebraska Search—Probable Cause</u>

Because Mikelic did not have a reasonable expectation of privacy in either Battistelli's rental car or the items seized from the rental car, the Court declines to address whether there was probable cause to search Battistelli's rental vehicle in Nebraska.

## III. **Conclusion**

Accordingly, the defendant's motion to suppress included in Dkt. #21 is DENIED.

SO ORDERED this <u>11th</u> day of May 2011, at Hartford, Connecticut.

/s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY
UNITED STATES DISTRICT JUDGE**